**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Peter PARK, Defendant–Appellant.**

No. 90–1761.

United States Court of Appeals,
Fifth Circuit.

Oct. 31, 1991.

Vacated in Part and Remanded for Resentencing on Grant of Rehearing in Part Jan. 14, 1992.*

* See 951 F.2d 634.

Carrie L. Huff, Lawrence A. Gaydos, Haynes & Boone, Dallas, Tex., for defendant-appellant.

John P. Bradford, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Ft. Worth, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, REAVLEY and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Defendant–Appellant Peter Park (Park) appeals his conviction for failure to file a report of international transportation of currency in excess of $10,000, in violation of 31 U.S.C. §§ 5316(a) and 5322(a) (1982) and 31 C.F.R. § 103.23(a), and for making a false statement to an officer of the United States in violation of 18 U.S.C. § 1001 (1982).[1] We question the exercise of prosecutorial discretion that led to this conviction, but there is no reversible error.

A jury found that Park willfully failed to declare more than $48,000 in U.S. currency to U.S. Customs Service officials as he attempted to board a commercial flight bound for South Korea on March 12, 1988. Customs later referred the matter to the U.S. Attorney, holding administrative forfeiture proceedings in abeyance and retaining Park's money pending the outcome of the criminal prosecution.

On appeal, Park argues that Customs' civil seizure and retention of the $48,000 was severe enough to constitute criminal punishment under *United States v. Halper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), so that his subsequent criminal prosecution for the same underlying conduct violated the Double Jeopardy Clause of the Fifth Amendment.[2] Next, Park, an ethnic Korean and business owner, insists the district court erred in admitting improper and prejudicial testimony by a Customs inspector regarding Korean business travelers' proficiency as speakers of the English language. Park further contends the government's use of certain statistical evidence during rebuttal closing

---

1. 31 U.S.C. § 5316(a) provides in pertinent part: "[A] person or an agent or bailee of the person shall file a report ... when the person, agent, or bailee knowingly—(1) transports, is about to transport, or has transported, monetary instruments of more than $10,000 at one time—(A) from a place in the United States to or through a place outside the United States...." Section 5316(a) echoes the Treasury Department currency reporting rules, which provide: "Each person who physically transports ... or attempts to cause to be physically transported, mailed or shipped, currency or other monetary instruments exceeding $10,000 at one time from the United States to any place outside the United States ... shall make a report thereof." 31 C.F.R. § 103.23(a). Pursuant to this authority, the Customs Service requires the filing of Customs Form 4790, the Report of International Transportation of Currency or Monetary Instruments. Under 31 U.S.C. § 5322(a), a person who "willfully" violates the currency reporting requirement shall be fined not more than $250,000, imprisoned for not more than five years, or both.

Finally, 18 U.S.C. § 1001 provides: "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully ... makes any false, fictitious or fraudulent statements ... shall be fined not more than $10,000 or imprisoned not more than five years, or both."

argument unfairly prejudiced his trial. He also faults the district court for providing an inaccurate and misleading explanation of his Fifth Amendment privilege against self-incrimination, and for admitting statements made by Park to Customs officials allegedly in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Finally, Park claims his prison sentence mandated by the Sentencing Guidelines violates the Eighth Amendment's proscription against cruel and unusual punishment.

## I.

Park was born and raised in South Korea and emigrated to the United States in 1974. In 1980 he became a naturalized U.S. citizen. Park moved to Plano, Texas in 1982 and by the following year owned and operated several small retail stores including a check-cashing business. Because Park's ability to speak and comprehend the English language was a key issue at trial, it is worth mentioning at the outset. Park is not a native English speaker and occasionally spoke through an interpreter during the proceedings in the court below. Park also introduced evidence that he suffered from a tongue-tied condition at the time of his questioning by Customs officials that made it difficult for his speech to be understood.

The events leading to Park's conviction occurred on March 12, 1988 at the Dallas/Fort Worth International Airport (D/FW). According to evidence adduced at trial, U.S. Customs inspector Gary Page arrived at D/FW terminal 2W at 8 a.m. on that day to process outbound Thai Airlines Flight 741 to South Korea. Page taped posters, written in Korean and Spanish, on the windows in the waiting area. The posters alerted passengers of the need to re-

port leaving the United States with currency in excess of $10,000. He also placed an English-language version of the poster on a podium in the passenger waiting area. At both 30 minutes and ten minutes before the scheduled departure of Flight 741, Page played a tape-recorded message over the public-address system describing the currency reporting requirements in several languages, including Korean.[3] Page testified that at ten minutes before the flight's scheduled departure, as the recording was being played for the second time, he noticed Park looking at one of the posters that described the currency-reporting requirements in Korean and Spanish.

At a signal from the Thai Airlines' representative, Customs officials moved to a position near the gate where passengers would board Flight 741. The officials had previously set up tables there for examining baggage and verifying declared currency. Precisely what happened next was contested at trial. According to the government, when Page asked Park if the latter was carrying in excess of $10,000 in currency, Park replied in clear English, "No," paused, and said, "$4,000." Park, however, testified that he said "$40,000" in response to Page's question and that Page misunderstood him. In either case, Park was referred to inspector Berry for verification. Berry testified that he asked the same question of Park and received the same answer, in clear English, as did Page. For his part, Park insists he told Berry he was carrying $40,000, not $4,000. At no time did either inspector give Park a currency reporting form to complete.

An initial inspection of Park's briefcase led Inspectors Page and Berry to conclude that Park was carrying in excess of $4,000.

---

2. "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb...." U.S. CONST. amend. V.

3. At trial, Park offered evidence that the taped announcements were not clearly audible in a restaurant where he and his wife were eating breakfast. A second Customs inspector working with Page, David Berry, testified that he saw

Park in the boarding area, and not the restaurant, during one of the two recorded announcements but could not remember which announcement. Additionally, both Park and his court-appointed Korean interpreter, a Mr. Kim, testified that the tape was difficult to understand in Korean.

Park was detained in an adjacent area and the money counted. A search of his briefcase yielded $48,000.[4] Inspector Berry confiscated this money along with Park's passport, airline ticket and boarding pass. At about noon, Customs special agent Duane Long arrived and questioned Park about his citizenship status, length of residence in the United States, occupation, use of English in his business, and his frequency of international travel. Long testified that he did not have difficulty understanding Park's English. In fact, at no time did Long, Berry or Page summon a Korean translator; all three Customs officials testified that Park spoke English clearly.[5]

At the end of this questioning, agent Long read Park his *Miranda* rights. When Park stated he did not want to answer further questions and wished to speak with an attorney, Long terminated the interview. Park was not arrested and left after roughly three or four hours of detention. Customs retained the $48,000 as well as Park's passport, ticket and boarding pass and referred the matter to the U.S. Attorney for the Northern District of Texas, who subsequently commenced criminal proceedings.

Several days later, Park received a letter, dated March 16, 1988, from Customs District Director David F. Greenleaf. In the letter, Greenleaf stated that a penalty of $48,065.00 had been assessed against Park "in addition to forfeiture of the monetary instruments." The letter added, however, that Park could seek mitigation of this penalty by providing information as to the source of the currency and its intended use. Attached to Greenleaf's letter was A Notice of Seizure and Information for Claim-

ants, Form AF–60, explaining Park's rights. In a letter dated April 15, 1988, Park's attorney submitted a Petition for Remission or Mitigation of Forfeitures and Penalties Incurred ("mitigation petition") as well as an Election of Proceedings, Form AF ("election-of-proceedings form"). In the latter form, signed by Park and dated March 22, 1988, Park indicated that he wanted Customs to consider his mitigation petition administratively. He waived his right to immediate civil forfeiture proceedings with the understanding that he could change his mind at any time.

The District Director acknowledged receipt of Park's mitigation petition and election-of-proceedings form in a letter dated April 19, 1988. The letter stated: "The petition is being forwarded to the Office of Enforcement for investigation. Upon receipt of their report of investigation and the outcome of the pending criminal case, this office will act on your petition." Park's counsel corresponded with Customs' Dallas/Fort Worth Office but no further action was taken.

On March 8, 1989, a federal grand jury in the Northern District of Texas indicted Park, and he was soon convicted on both counts. Park was sentenced to 15 months' imprisonment, a two-year term of supervised release, and a $100 mandatory assessment. Park timely appealed.

## II.

■ The linchpin of Park's first argument is that Customs' civil seizure and retention of his $48,000 in U.S. currency rose to the level of criminal punishment. Consequently, Park continues, the subsequent criminal conviction from which he appeals—based as it is on the same under-

4. Park later testified that he was carrying $5,000 of this money for a cousin to invest in South Korea, while another $3,000 was Park's spending money for the trip. As for why Park would tell Customs officials he was carrying $40,000 and not $48,000, Park testified on direct examination: "The $5,000 is not my money and the $3,000 I don't consider that as—I thought he was asking me how much was in the briefcase." It is undisputed, however, that all $48,000 was in Park's briefcase. In addition, Customs offi-

cials found $65 in Park's wallet. They returned this money to him before he left the airport. An inspection of Park's checked luggage uncovered no U.S. currency.

5. Among other things, Long testified that Park told him he used English in his daily business and had been back to Korea at least five times since emigrating to the United States.

lying conduct—violates the Double Jeopardy Clause. Park grounds this theory in *Halper*, in which the Supreme Court held that "under the Double Jeopardy Clause a defendant who has already been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution." *Halper*, 490 U.S. at 448–449, 109 S.Ct. at 1902.

In *Halper*, the manager of a medical laboratory that provided medical service to patients eligible for benefits under Medicare was convicted of submitting false claims for federal reimbursement, in violation of the criminal false claims statute. *See* 18 U.S.C. § 287 (1982). On 65 occasions Halper had requested reimbursement of $12 per claim when in fact his company was entitled to only $3 per claim, thereby defrauding the United States of $585. He was fined $5,000 and sentenced to imprisonment for two years. 490 U.S. at 437, 109 S.Ct. at 1895–96. Following Halper's conviction, the government brought a civil action against him under the False Claims Act. *See* 31 U.S.C. § 3729 (1982). That Act provided for a civil penalty of $2,000 per claim, "an amount equal to 2 times the amount of damages the Government sustains, because of the act of that person and costs of the civil action." Halper's $585 fraud would have resulted in a recovery by the government of more than $130,000. *Halper*, 490 U.S. at 438, 109 S.Ct. at 1896.

The district court held that Halper's fine violated the Double Jeopardy Clause, and a unanimous Supreme Court agreed. While acknowledging that the government can typically pursue both criminal and civil sanctions for the same underlying conduct, the *Halper* Court announced "a rule for the rare case, the case such as the one before us, where a fixed-penalty provision subjects a prolific but small-gauge offender to a sanction overwhelmingly disproportionate to the damages he has caused."

490 U.S. at 449, 109 S.Ct. at 1902. The new rule focuses on whether the civil sanction sought after the imposition of a criminal penalty bears a rational relationship to the goal of compensating the government for its loss. If so, double jeopardy is not violated. If, however, the civil sanction is so disproportionate that it "cross[es] the line between remedy and punishment," the clause is implicated. *Id.* at 450, 109 S.Ct. at 1902–03.[6]

The *Halper* Court invalidated a civil penalty imposed subsequent to a criminal prosecution for essentially the same underlying offense. Park, however, has framed the issue in terms of a civil penalty that preceded a criminal conviction. Urging us to extend *Halper* to this latter context, Park notes that several other courts have already concluded that *Halper* applies when a civil penalty is imposed prior to a criminal conviction. *See United States v. Mayers*, 897 F.2d 1126, 1127 (11th Cir.1990) ("Although in this case the civil penalty preceded, rather than followed the criminal indictment, the *Halper* principle that civil penalties can sometimes constitute criminal punishment for double jeopardy purposes would seem to apply whether the civil penalties come before or after the criminal indictment."), *cert. denied*, —— U.S. ——, 111 S.Ct. 178, 112 L.Ed.2d 142 (1990); *see also United States v. Marcus Schloss & Co., Inc.*, 724 F.Supp. 1123, 1126 (S.D.N.Y.1989) (punitive civil sanction imposed before criminal punishment violates double jeopardy); and *United States v. Sanchez*, No. M–90–020, Memo. Opinion (S.D.Tex. March 14, 1990), (in light of *Halper*, penalty enforced by Customs barred further criminal proceedings), *appeal pending*, Nos. 90–2577, 2613 and 2614.

Park raises an important question, but we cannot answer it here. Contrary to appellant's brief, *Halper* does not apply because the Customs Service never imposed a civil penalty on Park. Rather, Park specifically elected to delay civil forfeiture proceedings pending the outcome of

---

**6.** Applying this rule to *Halper*, the Court remanded the case to the district court to permit the government to present an accounting of its damages and costs. *Id.* at 452, 109 S.Ct. at 1903–04.

his criminal prosecution. Double jeopardy never attached.

In the letter dated April 15, 1988, Park's attorney submitted both the mitigation petition and the election-of-proceedings form to the District Director of Customs. The latter form gave Park two options. First, he could request that civil forfeiture proceedings commence immediately. In that case, Customs would begin publication of its Notice of Seizure and Intent to Forfeit, as provided by Section 609 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1609 (1982), and consider Park's mitigation petition while administrative forfeiture proceedings were pending or as soon as possible thereafter. Alternatively, Park could waive his right to the immediate commencement of administrative forfeiture proceedings while reserving the right to demand that Customs commence such proceedings immediately if he later changed his mind.

Park chose the latter option. In his mitigation petition, he asked Customs to release the seized $48,000 and mitigate the assessed $48,065 penalty. Park also submitted the election-of-proceedings form, signed and dated March 22, 1988, which specifically requested that Customs refrain from commencing immediate administrative forfeiture proceedings. The District Director responded in a letter dated April 18, 1988, acknowledging receipt both of Park's mitigation petition and election-of-proceedings form. The letter stated: "Upon receipt of [the Customs' Office of Enforcement] report of investigation and the outcome of the pending criminal case, this office will act on your petition." Subsequent letters by Park's counsel show that Park realized Customs was holding its administrative proceedings in abeyance pending the outcome of his criminal prosecution.

In short, there was no civil forfeiture and hence no penalty for *Halper* purposes. Park could have requested that Customs commence immediate civil forfeiture proceedings at any time, but he did not. Because no final administrative action or other adjudication of civil liability occurred prior to Park's criminal conviction, either with respect to the seized currency or the assessed penalty, Park was not twice put into jeopardy. Accordingly, his criminal conviction must stand.[7]

A double jeopardy question lurks nevertheless as to what actions Customs might permissibly take if Park's conviction is upheld. As discussed above, *Halper* invalidated a civil penalty that followed a criminal conviction for the same underlying offense. An attempt by Customs to forfeit Park's $48,000 and to impose an additional $48,065 penalty raises a scenario in which the Halper analysis might be appropriate. *See generally United States v. Hall,* 730 F.Supp. 646, 655–56 (M.D.Pa.1990) (government's attempt to impose disproportionate

7. It is undisputed that upon discovering the money, Customs officials never gave Park an opportunity to file a currency report. The outcome in this case seems harsh. Had Customs simply asked Park to file a currency report on the spot, this entire prosecution, and its resultant costs both to Park and the government, might have been avoided. If circumstances had warranted it, the government could have used the information contained in the currency report, together with Park's own statements as to how much money he was carrying, as the basis for investigating Park's financial dealings for possible impropriety. Instead, Customs seized the money more than three years ago and has since been awaiting the outcome, albeit with Park's permission, of the criminal prosecution by the U.S. Attorney. Not only was Park sentenced to prison, but at the very least the civil seizure may have already deprived him of several thousand dollars in simple interest.

The fact remains, however, that Park's failure to declare currency in excess of $10,000 is a crime, even if that money was obtained by legitimate means. This court has rejected the argument that the Due Process Clause requires Congress to utilize a less restrictive alternative, such as creating a rebuttable presumption that the funds in Park's possession were connected with criminal activity. *See United States v. O'Banion,* 943 F.2d 1422, 1433 (5th Cir.1991). Nevertheless, prosecutorial discretion ought to focus on suspects whom the government believes are violating the laws at which the currency reporting regulations were aimed (drug trafficking, money laundering, and tax evasion), rather than on the absent-minded victim of relatively arcane regulations.

civil penalty on defendant who had pled guilty to charge of transporting negotiable instruments out of the country without filing currency reports, in violation of 31 U.S.C. §§ 5316(b) and 5322(b), violated double jeopardy). While calling attention to this scenario, we express no views upon its probable outcome. This court is not in the business of issuing advisory opinions.

Finally, we stress that Customs cannot indefinitely retain the money it has seized from Park. Once this criminal appeal has been resolved, Customs must act on Park's mitigation petition in a timely manner or risk violating the Due Process Clause of the Fifth Amendment. *See United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in U.S. Currency,* 461 U.S. 555, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983) (articulating test for deciding whether a delay between the seizure of monetary instruments and the commencement of proceedings for their forfeiture violates due process).[8]

### III.

▮ Park next insists the district court erred in admitting prejudicial testimony by Customs inspector Page regarding Korean business travelers' proficiency as speakers of the English language. On direct examination, Page testified as follows:

Q. Does there come a time when you are unable to speak with an individual from another country because you do not understand their language?

A. It happens at times, yes.

Q. And what do you do at that time?

A. We have interpreters at the airport itself employed by the Airport Board that will interpret for us.

Q. With regard to the persons flying in and out of DFW Airport from Southeast Asia and the Orient, have you had occasion to speak with those persons flying in and out of DFW since 1983?

A. Yes, sir.

Q. And with their ability to converse in the English language, what countries do you find that are more able to converse in English?

MR. BRENDER (defense counsel): Your Honor, I'm going to object. I don't believe he's qualified to make that kind of—

THE COURT: Well I think he can answer that. He can tell us what he knows. I will overrule it.

MR. BRENDER: He's not an authority; I don't think he's made a study on it, your Honor, and I will object to it unless he has.

THE COURT: Just from experience he can tell us which countries speak English better than the rest of them. I will overrule the question.

THE WITNESS: Break it down into two basic classes of passengers that come into DFW Airport the business class people come from Korea, Taiwan, Thailand, Laos; the great majority speak English. The tourists coming in from the various countries I mentioned will need interpreters.

Park contends the district court's decision to allow inspector Page's testimony was so prejudicial that it compromised the fundamental fairness of his trial. The government counters that Page's testimony was admissible as opinion testimony of a lay witness under Fed.R.Evid. 701.[9] Al-

---

8. *See also* Annotation, *Forfeiture, Under 31 U.S.C.S. § 5317(c), of Monetary Instruments Transported into or out of United States Without Reporting as Required by 31 U.S.C.S. § 5316(a),* 90 A.L.R.Fed. 222, 230–231 (1988) (listing cases in which a delay between civil seizure of monetary instruments and the commencement of judicial proceedings for their forfeiture did not violate due process); and Annotation, *Delay Between Seizure of Personal Property by Federal Government and Institution of Proceedings for Forfeiture Thereof as Violative of Fifth Amendment Due Process Requirements,* 69 A.L.R.Fed. 373, 384–85 (1984) (listing cases in which the delay in civil forfeiture proceedings occasioned by a prior criminal prosecution raised due process concerns).

9. Rule 701 provides: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inference is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony of the determination of a fact in issue."

ternatively, the government characterizes it as expert testimony under rule 702.[10]

Viewed in its totality, the record suggests the prosecution was attempting to show inspector Page's familiarity with various Asian dialects, as opposed to branding Park with the gross and insidious generalization that because many Korean business travelers speak a certain way, Park must have, too. For instance, on cross-examination the following exchange took place between Page and Park's counsel:

Q. You are saying that having made this study of people and their dialects and which people can speak good English and which people can't; isn't that correct?

A. I recall making no statement that I made a study of dialect. I have been exposed to many many dialects as a Customs officer. I do remember the incident and I remember clearly Mr. Park stating in very clear English "$4,000.00."

Q. Did he say pour instead of four?

A. He did not, sir.

Q. He did not say porty instead of forty?

A. Most definitely not, sir.

Q. You are familiar with Orientals that have that type of dialect, are you not?

A. I have run into some that have, yes, sir.

This and later testimony by Page is arguably consistent with rule 701. Page made clear he was testifying based on his first-hand knowledge of Asian dialects and was not offering an opinion on Park per se.

It is possible that this distinction may have been lost on the jury. But even assuming the court erred in admitting Page's initial testimony, that error was harmless. The government produced substantial evidence at trial dealing with Park's proficiency as an English speaker, including testimony from two other Customs officials who questioned him. Park himself took the stand and testified extensively, although not completely, without the help of an interpreter, giving the jury an opportunity to form their own opinions as to his ability to speak and comprehend English, as well as his experience as a business owner and traveler. The district court's error, if error it was, did not "seriously affect the fairness, integrity, or public reputation of [the] judicial proceedings and result in a miscarriage of justice." *United States v. Greer*, 939 F.2d 1076, 1095 (5th Cir.1991) (quoting *United States v. Howton*, 688 F.2d 272, 278 (5th Cir.1982)).

### IV.

■ Park raises three other challenges to the way in which his trial was conducted. First, he claims the government's reference during rebuttal closing argument to statistics not in evidence unfairly prejudiced his trial. Specifically, the prosecutor asserted that Park could not be statistically considered an "ordinary American" because he had owned five separate businesses since 1976, including a check-cashing business that cashed $1 million per month at the time of the incident, and he had travelled abroad several times.[11] The government offered this information in an attempt to show that Park was aware of the currency reporting requirement yet willfully defied it. When Park objected, the district judge warned the prosecutor to "[s]tick to the facts." The prosecutor then stopped referring to statistics and alluded to matters already in evidence pertaining to Park's own experience as an international traveller, including several trips abroad, telling the jury "your commonsense would lead you to believe that this person would be [sic] a higher degree of knowledge than an ordinary citizen."

We must view the prosecutor's statement in light of Park's entire trial, for "a

---

10. Under rule 702, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

11. At trial, the government introduced evidence of a prior trip by Park to Mexico. Upon returning to the United States, Park completed a Customs declaration form that, among other things, included the currency reporting requirement.

criminal conviction is not to be lightly overturned on the basis of a prosecutor's arguments standing alone." *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). We may not reverse Park's conviction unless the prosecutor's remarks were not only inappropriate but harmful. *United States v. Chase*, 838 F.2d 743, 749 (5th Cir.), *cert. denied*, 486 U.S. 1035, 108 S.Ct. 2022, 100 L.Ed.2d 609 (1988). In view of the substance and overall context of the prosecutor's remarks, including his obvious appeal to the jury's "commonsense" rather than a statistical study not in evidence, we cannot say the prosecutor's statements affected Park's substantive rights. Fed.R.Crim.P. 52(a).

Second, Park contends the district court committed reversible error by giving him an inaccurate and misleading explanation of his privilege against self-incrimination. Park admits in his brief that the trial judge was under no duty to instruct him as to the scope of the privilege. Nonetheless, Park argues that once the judge undertook the task, Park "was entitled to a correct and complete explanation." We hasten to note, however, that because Park's counsel did not object to the judge's explanation, this court's review is limited to plain error. Thus, even assuming the explanation was faulty, we are unconvinced that it undermined the fundamental fairness of his trial.

■ Finally, Park argues that the failure of Customs officials to warn him of his *Miranda* rights prior to questioning him rendered his responses to those questions inadmissible. This argument is without merit. This court has recognized that "[t]he *Miranda* requirement is not ... applicable to every situation where law enforcement officers are asking questions." *United States v. Henry*, 604 F.2d 908, 915 (5th Cir.1979). Because it is "the compulsive or coercive aspects of a custodial situation which trigger the *Miranda* requirement," *Henry* established that *Miranda* warnings are not required during routine questioning and searches by Customs agents. *Id.* As for what constitutes a coercive detention and search, this court adopted the test that "[a] suspect is ... 'in

custody' for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir.), *cert. denied*, 488 U.S. 924, 109 S.Ct. 306, 102 L.Ed.2d 325 (1988). Border inspections that are "presumptively temporary and brief" and operated in a "regularized manner" with "advance notice" and "visible signs of authority" tend not to instill the perception of restraint necessary to trigger the *Miranda* requirements. *Id.* at 598.

Most recently, in *U.S. v. Berisha*, 925 F.2d 791 (5th Cir.1991), this court applied the *Bengivenga* analysis to hold that a routine airport stop and questioning by Customs officials of a traveler suspected of failing to file a currency report and making false statements does not require *Miranda* warnings. *Berisha*, which involved a detention and questioning by Customs inspectors under circumstances similar to those at issue here, is indistinguishable from Park's case and therefore controls it. *Id.* at 797.

V.

Finally, Park insists his prison sentence mandated by the Sentencing Guidelines violates both the Eighth Amendment and Congressional intent. Accordingly, Park argues his punishment violates the proportionality requirement of *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), as well as the statutory scheme of § 5316(a), which Park contends was aimed only at failures to report money derived from illegal activities.

Both claims are unconvincing in light of our recent decision in *O'Banion*, 943 F.2d at 1432. O'Banion, who had been convicted of violating § 5316(a) for failing to file a currency report when he entered the United States from Mexico with more than $10,000 in his possession, challenged his punishment on Eighth Amendment and statutory grounds. This court specifically held that § 5316(a) applies "whether or not the

money was derived from legitimate business" and does not constitute cruel and unusual punishment. *Id.* at 1432.

## VI.

For the foregoing reasons, the judgment of the district court is AFFIRMED.