**UNITED STATES of America**

v.

**Farice DAIGLE, Jr.**

**Crim. No. 92–60032–03.**

United States District Court,
W.D. Louisiana,
Lafayette–Opelousas Division.

Aug. 7, 1995.

Assistant U.S. Attorney, Brett Grayson, for U.S.

David C. Willard, for defendant.

### JUDGMENT

SHAW, Chief Judge.

For the reasons assigned in the Report and Recommendation prepared by the Magistrate Judge, and based on the evidence heard during the trial of this matter, the defendant's Motion to Dismiss on the Basis of Double Jeopardy is DENIED.

### REPORT AND RECOMMENDATION

TYNES, United States Magistrate Judge.

### INTRODUCTION

The defendant's Motion to Dismiss Prosecution Based On Double Jeopardy filed on July 19, 1995 is now pending before the undersigned for report and recommendation pursuant to the Standing Order issued July 8, 1993. The government filed a memorandum in opposition supported by ten exhibits [1]

---

1. The exhibits are numbered A through J. The exhibits include: A—Declaration of Forfeiture and the Application and Order of Seizure entered in Sundry No. 92–0358; B–I—Transcripts of sworn trial testimony; and J—Interrogatory Re-

sponses. The transcripts reflect sworn testimony from the multiple trials conducted to resolve the charges against the eighteen co-defendants indicted for involvement in the same drug trafficking operation out of which the charges against

on July 26, 1995, and an evidentiary hearing was conducted on July 28, 1995. During the evidentiary hearing, the defense presented the testimony of Farice Daigle and one exhibit, a Bill of Sale concerning a 1987 Chevrolet Blazer, and the government offered one additional exhibit composed of two documents, a notice of seizure of $14,000 currency issued by the Department of Drug Enforcement Administration and a copy of a return-receipt requested mail receipt bearing the signature of Daigle's girlfriend, Gwothlyn Gibson.[2]

## STATEMENT OF ISSUE PRESENTED

The defendant moves for dismissal of these criminal proceedings on grounds that the previous administrative forfeiture of $14,000 currency seized from the residence where the defendant, Farice Daigle, and four other co-defendants were arrested on April 9, 1991, constitutes "punishment" for purposes of a double jeopardy analysis, and argues, that these proceedings are thus barred by the Double Jeopardy Clause of the Fifth Amendment. It is undisputed that on May 15, 1992, the undersigned magistrate judge issued a seizure warrant seizing the relevant $14,000 currency pursuant to 21 U.S.C. 881(a)(6),[3] and further, that a Declaration of Forfeiture was entered on July 31, 1992 declaring the currency forfeited.[4]

## APPLICABLE CASE LAW AND LEGAL STANDARDS

The Double Jeopardy Clause of the Fifth Amendment guarantees that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. Most double jeopardy cases involve the prohibition of two criminal prosecutions.[5] Nevertheless, the scope of the Double Jeopardy Clause has clearly been expanded by the Supreme Court to preclude multiple punishments as well. *Department of Revenue of Montana v. Kurth Ranch, Id.; United States v. Halper*, 490 U.S. 435, 441, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487, 496 (1989). In *Halper*, the Supreme Court held that the Double Jeopardy Clause provides three separate protections for criminal defendants: against reprosecution for the same offense after an acquittal; against prosecution for the same offense after a conviction; and against multiple punishments for the same offense. 490 U.S. at 441, 109 S.Ct. at 1897. As in *Halper*, the issue raised here involves the protection against multiple punishment.

Although *Halper* involved a civil fine under the False Claims Act, 31 U.S.C. 3729–3731, rather than a civil forfeiture, the holding of *Halper* applies equally to civil forfeitures. The *Halper* court stated that "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be

Farice Daigle arise. No objection was asserted to the court's consideration of these transcripts; nor was there a request for cross examination of the pertinent individuals. In any event, reservation of a ruling until after the trial will resolve any concerns in this regard.

2. A transcript of the evidentiary hearing has been filed into the record.

3. Magistrate Case No. T92–0128M–01, subsequently Sundry No. 92–0358, contains the Application and Affidavit For Seizure Warrant and the Seizure Warrant. Said documents were attached to the government's opposition as part of Government Exhibit A.

4. The Declaration of Forfeiture is attached to the government's opposition as Government Exhibit A.

5. In this court's opinion, the words of the framers contemplate only the prohibition of multiple prosecutions, and the expansion to multiple pun-

ishments has created difficult legal issues and tortured legal analyses which are evidenced in various published opinions from district and circuit courts across the country. The difficulties created by this expansion are firmly acknowledged by Justice Scalia, joined by Justice Thomas, both of whom expressed dissent to *Department of Revenue of Montana v. Kurth Ranch*, — U.S. ——, ——, 114 S.Ct. 1937, 1955, 128 L.Ed.2d 767 (1994), as follows: "It is time to put the *Halper* genie back in the bottle, and to acknowledge what the text of the Constitution makes perfectly clear: the Double Jeopardy Clause prohibits successive prosecution, not successive punishment." — U.S. at ——, 114 S.Ct. at 1958. Because the Supreme Court acknowledged the Excessive Fines Clause as a constitutional defense to civil forfeitures, in *Austin v. United States*, — U.S. ——, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), justice may be accomplished without extending the jeopardy analysis to civil forfeitures. The issue will undoubtedly be addressed again by our highest court, and I suspect it will be soon.

explained as also serving either retributive or deterrent purposes, is punishment as we have come to understand the term." 490 U.S. at 448, 109 S.Ct. at 1902. Thus, *Halper* directs an analysis of the civil exaction (whether a fine, forfeiture or tax) to determine whether it serves a remedial or punitive purpose. The circuit courts' interpretations of *Halper* have, however, not been consistent. In fact, the Fifth and the Ninth Circuit's interpretations of *Halper* are firmly and directly in conflict.[6]

The defense vehemently urges this court to adopt the Ninth Circuit's interpretation of *Halper*. In a nutshell, the Ninth Circuit held that the government violated the Double Jeopardy Clause by obtaining criminal convictions and then continuing to pursue the forfeiture actions arising out of the same offense. *United States v. $405,089.23 U.S. Currency*, 33 F.3d 1210 (9th Cir.1994).[7]

In reaching this conclusion, the Ninth Circuit expressly rejected the case by case approach to determine whether a forfeiture constitutes punishment, and held instead that the determination of whether a forfeiture constitutes "punishment" turns on an evaluation of the characteristics of the forfeiture statute itself. 33 F.3d at 1220. The court went on to hold categorically that all forfeitures under the statutes at issue, one of which included the statute at issue here, 21 U.S.C. 881(a)(6), following a criminal prosecution, would constitute "punishment" for purposes of a double jeopardy analysis because the purpose of the statute was not solely remedial.

This court is mindful of *its* duty to follow the law as it is declared by the Fifth Circuit, and will do so, despite the defendant's plea that it do otherwise. In *United States v. Tilley, supra,* the Fifth Circuit, interpreting *Halper,* adopted a case by case approach for determining whether a civil forfeiture constitutes "punishment" for double jeopardy pur-

poses. The following language from the *Tilley* opinion provides the guidelines which we must apply to determine whether forfeiture of the $14,000 currency constitutes "punishment."

"In *Halper,* the Supreme Court established the analytical methodology that will guide our determination of whether the civil forfeiture of the proceeds from illegal drug sales in this case served a punitive purpose, or a wholly remedial purpose. As explained below, this methodology focuses on the relationship between the amount of the civil sanction and the amount required to serve the remedial purpose of reimbursing the costs incurred by the government and society as a result of the wrongful conduct. We should make clear, however, that the sanction in *Halper* did not involve the proceeds from the crimes charged and the fact that the property forfeited in today's case constitutes unlawful proceeds is crucial to our analysis."

18 F.3d at 297.

"The Court declined to determine whether a sanction is punitive by focusing on whether a defendant subjectively feels the 'sting of punishment.' Instead, the *Halper* Court examined the civil sanction in that case with a focus on whether it was so excessive that it was punitive. The Court stated that a civil sanction constitutes criminal punishment only in the 'rare case' in which the amount of the sanction is 'overwhelmingly disproportionate' to the damages caused by the wrongful conduct and thus 'bears no rational relation' to the goal of compensating the government for its loss, but rather appears to qualify as 'punishment' within the plain meaning of the word."

18 F.3d at 298 (citations omitted).

In *Tilley,* the property forfeited was clearly established as "the proceeds of illegal drug trafficking or directly traceable thereto." 18

---

6. In an amended opinion filed May 30, 1995, in *United States v. $405,089.23 U.S. Currency,* 56 F.3d 41 (9th Cir.1995), the Ninth Circuit acknowledges that its interpretation of *Halper* is "squarely in conflict" with the opinion expressed by the Fifth Circuit in *United States v. Tilley* 18 F.3d 295 (5th Cir.), *cert. denied,* —— U.S. ——, ——, 115 S.Ct. 573, 574, 130 L.Ed.2d 490 (1994).

7. It is worth noting here that the *Halper* principle applies whether the civil penalty or criminal punishment comes first. *United States v. Tilley,* 18 F.3d 295, f.n. 5 (5th Cir.1994).

F.3d at 297, n. 2. Thus, *Tilley* focuses entirely upon whether the $650,000.00 of cash and other personal property seized bore a "rational relation to the costs incurred by the government and society resulting from the defendant's criminal conduct." 18 F.3d at 298. *Tilley* states categorically as follows:

> "The forfeiture of proceeds of illegal drug sales serves the wholly remedial purposes of reimbursing the government for the costs of detection, investigation and prosecution of drug traffickers and reimbursing society for the costs of combatting the allure of illegal drugs, caring for the victims of the criminal trade when preventative efforts prove unsuccessful, lost productivity, etc."

*Id.* (citation omitted).

*Tilley* goes on to note that although the exact costs are not subject to precise measurement, various sources estimate the costs of illegal drug activity to government and society total $60 to $120 billion per year. *Id.* at 299. Relying upon this estimate of total costs to the nation caused by the illegal drug trade, the fact that the defendants forfeited only a portion of the total proceeds derived from their operation, and the fact that all of the property forfeited was the proceeds of illegal drug sales, *Tilley* concluded that the $650,000 of cash and property forfeited actually failed to compensate fully for the wrongs done. *Id.*

### LEGAL ANALYSIS

### WHAT WAS THE SOURCE AND INTENDED USE OF THE FORFEITED CURRENCY?

Turning to the case at hand, we must first determine the source and intended use of the $14,000 currency made the subject of the government's Declaration of Forfeiture. Was the currency the proceeds of illegal drug sales, or directly traceable thereto? Or was it "intended to be furnished ... in exchange for a controlled substance ... or

intended to be used to facilitate any violation of" drug laws? *See* 21 U.S.C. Section 881(a)(6) (1988).

Although *Tilley* dealt solely with the proceeds of illegal drug sales, the ultimate reasoning extends logically to proceeds that are intended to be exchanged for drugs or intended to be used to facilitate violation of drug laws. Even under circumstances where proceeds used in exchange for drugs or to otherwise facilitate illegal drug transactions have been derived from legal activities, *Tilley* instructs that the ultimate inquiry is whether the amount of the currency forfeited appears to serve the remedial purpose of reimbursing the costs incurred by the government and society, or in the alternative, a purely punitive purpose.

The evidence related to the source of the proceeds and the purposes for which it was intended is contained within the testimony of Farice Daigle and the two exhibits admitted at the evidentiary hearing, as well as the exhibits attached to the government's memorandum in opposition. Having evaluated all of the evidence with great care, it is my finding for purposes of the pending motion that the $14,000 currency was derived by Farice Daigle from the sale of a 1987 Chevrolet Blazer transacted on April 5, 1991 in Houston, four days prior to Daigle's arrest and the commensurate physical seizure of the currency.[8]

It is my further finding, however, solely for purposes of the pending motion, that the Blazer in question was paid for, in part, by drug proceeds obtained by Farice Daigle between the years of 1989 and 1991,[9] and accordingly, that a portion of the forfeited proceeds, the exact amount of which is not subject to precise determination, are traceable to proceeds of illegal drug activities.

Farice Daigle's testimony at the evidentiary hearing established, inter alia, that he graduated from high school in 1987, that following graduation he worked for a few

---

**8.** See Defendant's Exhibit A, Bill of Sale dated April 5, 1991.

**9.** The findings requisite to resolution of the motion are inextricably intertwined with the ultimate issue of guilt or innocence. Because a pretrial report and recommendation on the mo-

tion is anticipated by the parties and the court's Standing Order, the undersigned has proceeded to make the necessary findings. The import of the findings is, however, limited to the scope of this double jeopardy motion.

months in 1988 doing contract labor for Gulf Coast Chemical Company in Baton Rouge, that he attended T.H. Harris Vo–Tech for a while in 1989 or 1990 and University of Southwestern Louisiana in 1990, that he did not work at all while in school, and that he worked on a contract basis doing occasional customizing work on automobiles for West Park Collision, a shop located in Houston, on and off for six or seven months while residing in Houston during 1990 and/or 1991. He testified that he was paid either in cash or in property, such as rims for a vehicle or a wrecked vehicle, etc. And that as a result, there is no record of his employment. While under cross examination, he testified that he sometimes earned $100.00 or sometimes $200.00 and that he worked approximately three times out of the month during the six or seven months he was in Houston. Based on this testimony, he earned, at most, $600.00 per month. Thereafter, during continued cross examination by the government he repeatedly stated either that he did not recall or did not know how much money he made at West Park Collision. Interestingly, upon redirect by his own counsel, he immediately recalled that he had actually earned as much as $1,500.00 per job. Given his earlier, and repeatedly inconsistent, testimony on direct and cross examination, the testimony on redirect is rejected as less than credible.

The import of all of this is that Farice Daigle has presented inadequate evidence that he had sufficient legal income to support basic needs between 1989 and April 1991, much less the $6,800.00 which he testified was paid for the Blazer in November 1989. The testimony that Gwothlyn Gibson made some payments on the vehicle is acknowledged as credible. In fact, it is this testimony that compels the conclusion that illegal drug proceeds comprised only a part of the purchase price of the vehicle.[10]

In further support of the above finding, it is noted that the record is replete with compelling evidence of Farice Daigle's involvement, indeed leadership, in the illegal drug trafficking operation made the target of the extant federal prosecution. See Government Exhibit B, Gavin Gaile's sworn testimony, Trial of Rodney Williams, pp. 45–48, 50, 51, 53, 56, 58–63; Government Exhibit C, Herbert J. Hudson's sworn testimony, Trial of Rodney Williams, pp. 133–135, 137, 139, 142–149; Government Exhibit D, Don Jackson's sworn testimony, Trials of Herbert Hudson and Terry Buchanan, pp. 63, 68, 69, 72–74, 77–79, 81, 85–89, 91–93, 97, 101, 102, 108, 109, 112, and second transcript in Exhibit D, pp. 23, 24, 26, 26, 28–31; Government Exhibit E, John Eric Jolivette's sworn testimony, Trial of Herbert Hudson and Terry Buchanan, pp. 212–215; Government Exhibit F, John Drake Jolivette's sworn testimony, Trial of Herbert Hudson and Terry Buchanan, pp. 217–220; Government Exhibit G, sworn testimony of Felix Barnes, Jr., Trial of Rodney Williams, p. 100; Government Exhibit I, sworn testimony of Gavin Gaile's, Trial of Herbert Hudson, pp. 167, 169, 170, 171, 173, 175, 178, 179, 182, 184, 188, 189, 199, 201, 202, 204–05, 208–09.

The sworn testimony in the transcripts cited above establish that the drug trafficking operation prosecuted under the referenced case number may have transported as much as 200 kilograms of cocaine between Houston and Lafayette/Opelousas roughly between the years of 1989 and 1991.

The undersigned further concludes that the $14,000 seized during the arrest on April 9, 1991 was intended to be exchanged for an illegal controlled substance, most specifically for the kilogram of cocaine contained in the black bag carried by Jerome Wilford as he exited a taxi upon his arrival at the residence where the arrest and physical seizure of the proceeds occurred. This conclusion is based upon statements contained in the Affidavit In Support of the Application for Seizure Warrant.[11] The affidavit also indicated that the kilogram had an approximate street value of $40,000. The $14,000 cash at issue here was located in a safe inside the residence where the arrest occurred. It is apparent to this

---

10. Ms. Gibson was given timely notice of the seizure, but failed to respond. See Government Exhibit A, Return–Receipt–Mail card signed by Ms. Gibson on June 23, 1992.

11. Government Exhibit A.

court that the $14,000 was intended to be exchanged for the kilo in the black bag.

The defendant's testimony at the evidentiary hearing indicated that the $14,000 was going to be given to his mother to purchase "lots behind her house." He explained that the cash had not been delivered to her, even though four days had elapsed since the proceeds were obtained, because she was out of town. This explanation is suspect for several reasons. If the proceeds had been destined for donation to his mother, it would have been more convenient and safer to convert the funds to a bank or cashier's check, as well as more economical than buying a safe to protect the funds while maintained at the 109 Tunney Drive address. Furthermore, given the defendant's lack of regular income, it is improbable that he would have donated the $14,000 to his mother to buy raw land. Having evaluated the defendant's credibility and having found it lacking, *supra,* and for the additional reasons offered immediately above, the defendant's explanation of the intended use of the proceeds is rejected.

Having determined that the $14,000 is traceable in part to illegal drug proceeds, and that the currency was intended, in any event, to be exchanged for a kilogram of cocaine, the court may now turn to the inquiry outlined in *Tilley.*

### WAS THE FORFEITURE REMEDIAL OR PUNITIVE IN NATURE?

█ The ultimate inquiry outlined in *Tilley, i.e.* is the forfeiture remedial or punitive, governs resolution of the pending motion, even though the source and intended use of the currency at issue here was not limited to illegal drug proceeds as was the forfeited property in *Tilley.* Even under circumstances where proceeds used in exchange for drugs or otherwise to facilitate illegal transactions were derived entirely from legal activities, a logical interpretation of *Halper* still requires that this court determine whether the amount of the currency forfeited appears

to serve the remedial purpose of reimbursing the costs incurred by the government and society, or in the alternative, a punitive purpose. This court finds no significant analytical distinction for purposes of forfeiture between proceeds which are derived from an illegal drug transaction and proceeds which are intended to be used in exchange for illegal drugs. This finding is made with full cognizance of the emphasis which *Tilley* placed upon the fact that the proceeds at issue there were illegal.

█ Finally, we address the ultimate issue: Was the $14,000 forfeiture remedial or punitive in nature. Relying upon the facts set forth in *Tilley* concerning the overall costs of the illegal drug trade to this nation, and more specifically, the size and extent, and inevitable costs incurred in connection with the detection, investigation and prosecution efforts involved in bringing the drug trafficking operation in which Farice Daigle, and eighteen others were involved, to trial, it is clear that the forfeiture of $14,000 served remedial purposes only. The fact that the $14,000 was intended to be exchanged for cocaine with a street value of $40,000 further bolsters the conclusion that the forfeiture served remedial purposes only.

### CONCLUSION AND RECOMMENDATION

█ In sum, I conclude that the forfeiture of $14,000 was solely remedial, and accordingly, that the forfeiture does not constitute punishment for purposes of a double jeopardy analysis. It is my recommendation that the pending motion to dismiss on grounds of double jeopardy be DENIED. It is further recommended for reasons mentioned hereinabove that the court reserve a final ruling on the motion until after the trial is concluded. Counsel are granted through **Friday, August 4, 1995** to file objections to this report and recommendation. Any request for an extension of said deadline should be directed to the trial judge.[12]

12. For the sake of completeness, I now briefly address three issues raised by the parties which I did not grant full discussion. First, I reject the government's contention that Farice Daigle waived his right to raise the double jeopardy issue through his failure to object to the forfei-ture. His ownership of the proceeds is established in the Affidavit in Support of the Application for Search Warrant. Absent evidence of ownership of the proceeds at issue, the result may have been different. Under the circumstances, however, the issue did not warrant fur-

Counsel are directed to furnish a courtesy copy of any objections or responses to the district judge and the undersigned at the time of filing.

FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATION CONTAINED IN THIS REPORT BY FRIDAY, AUGUST 4, 1995 SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS ON APPEAL EXCEPT UPON GROUNDS OF PLAIN ERROR OR MANIFEST INJUSTICE. See *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Carter v. Collins*, 918 F.2d 1198, 1203 (5th Cir.1990).[13]

Lafayette, Louisiana, this 4th day of August, 1995.

ther discussion. Second, with respect to Daigle's contention that he did not receive proper notice of the forfeiture, the issue is of no consequence to the outcome of the pending motion. The forfeiture occurred. Thus, a double jeopardy evaluation was required. Third, it is clear from *United States v. Park*, 947 F.2d 130 (5th Cir.1991) that the civil penalties imposed in administrative forfeitures may constitute punishment for double jeopardy purposes.

**13.** All of this could be avoided if prosecutors would seek both forfeiture and imprisonment via the same indictment. A reading of the discussion of this approach in *United States v. Torres*, 28 F.3d 1463 (7th Cir.1994) is strongly recommended.